DETERMINED IN THE

# FIRST DEPARTMENT

AT

# GENERAL TERM,

## October, 1894.

CHARLES G. STEVENS and Another, Trustees of MARIETTA R. STEVENS, Respondents and Appellants, *v.* JOHN L. MELCHER and Others, as Executors, etc., of PARAN STEVENS, Deceased, and Others, Appellants and Respondents.

*Cost of repairs to real property belonging to a trust estate — when properly chargeable to the corpus of the trust fund — when trustees may erect buildings and make repairs from the principal — reimbursement of a life tenant for permanent improvements to real property — application of money received by an executrix — rate of interest — fire insurance premiums apportioned between the life tenant and the remaindermen — knowledge necessary to a ratification — contract between trustee and cestui que trust — commissions of trustees — interest on legacies — when a judgment will not be modified upon appeal.*

A testator by his last will and testament created, for the benefit of his widow, a trust which, in a proceeding brought for the judicial construction of his will, it was determined might be made up of either real or personal estate. The executors of the will thereafter conveyed to the trustees of such trust, real estate which was proved to be of a certain value before a referee in a suit to which all the parties interested were parties, and in which they appeared.

At the time of such transfer there existed serious latent defects in the construction of one of the buildings transferred, unknown to any of the parties to the transaction, and of such a character as to render the building unsafe; it threatened to fall and was a menace to the public as well as to the occupants of the building. Knowledge of such defects coming to the building department of the city wherein such real estate was located, formal notice was given that the repairs needed should be made. If such defects were not remedied and the building made safe, the city had authority to make the repairs, the expenses of which would constitute a lien upon the land.

The trustees of the trust fund, having no money applicable to that purpose, applied to the executors of the estate, who advanced the necessary sum with the

understanding that the question, whether the estate or the trust or the income of the trust should be charged with the expense, should be left open for judicial determination.

*Held,* that unless there was an agreement on the part of the executors to pay the cost of the repairs to the building transferred to the trustees, or unless the conveyance of such real estate contained a covenant broad enough to cover such an expense, there was no basis for imposing the cost of such repairs upon the estate in the hands of the executors;

That there was no obligation on the part of the remaindermen to make such repairs, inasmuch as remaindermen are not liable to make repairs to real estate when not in the possession thereof, unless under an express agreement to do so, nor was the tenant for life bound to meet out of her income such compulsory expenditure ;

That a court of equity might properly direct the distribution of the expense between the life tenant and the remaindermen in proportion to their respective interests, by charging the expense upon the capital of the trust fund on the same principle that assessments for permanent improvements are chargeable against the capital of an estate.

There are circumstances under which the trustees named in a will are authorized to use the moneys of the trust in the erection of a building upon a portion of the real property, which constitutes a part of the trust fund, the will conferring upon the trustees power to change investments.

The general rule that trustees cannot raise any sum out of, or make any charge upon, the *corpus* of the trust estate for repairs, however the need of such repairs may arise, has been so far modified that a court has power to charge upon the capital of the trust estate a sum compulsorily expended in making repairs.

Where trustees are authorized to accept real estate as part of the *corpus* of the trust, they may put such estate in tenantable repair, and the amount expended for such repairs will be charged on the trust fund as part of the purchase money, and, under the provisions of a last will and testament, it may be within the power of the trustees of a trust estate created thereby to make necessary improvements to real estate, and they may be allowed, out of the *corpus* of the trust fund, that portion of the sum expended in making such improvements which is added to the permanent value of the trust.

Where it appears that a sum was expended by a tenant towards the permanent improvement of real property forming part of a trust fund, but there is no proof that it would otherwise have been paid as a portion of the rent thereof to which the life tenant was entitled, such expenditures by the tenant being voluntary and not required by his lease, the life tenant cannot be reimbursed out of the trust fund the amount thus expended for such improvements.

Where the executrix named in a will receives moneys of the estate in her official capacity, she is deemed to have applied them most beneficially for the estate of which she is the executrix.

When moneys belonging to an estate come into the hands of one of the executors of the will disposing thereof, who is a legatee thereunder, it is proper to

hold that such moneys were applied in payment of the sums due such person on account of her legacy and the interest thereon, and the interest on the unpaid balance of a trust estate, of which the executor was the beneficiary, as of the several dates when they were received.

Where it was provided by a contract made in October, 1873, that a person was "to receive the interest to which in law she is entitled on the unpaid part of her trust legacy," the rate of interest to which she is entitled thereunder after January 1, 1880, is that which the law would allow her, viz., six per cent.

Where the buildings on real estate forming a part of the *corpus* of a trust fund are covered by policies of fire insurance, which are made payable in case of loss to parties holding mortgages covering the premises, the amount expended for premiums on such policies should be apportioned between the life tenant and the remaindermen, by deducting the amount of the same from the *corpus* of the trust fund.

To ratify is to sanction an act already done. In a legal sense it means that a party having knowledge of a defect in an act done, and of his right to ratify or reject it, concludes to confirm it. The rule in such case is that a party who relies upon a ratification of his neglectful or wrongful act to protect him, must show that it was made with full knowledge of all the material facts and circumstances, and when a party sought to be affected is a *cestui que trust*, it is also necessary to show that she was fully apprised of the effect of the acts ratified and of her legal rights in respect thereto.

A *cestui que trust* agreed with her trustees and others interested in the premises, by a contract made and executed October twenty-eighth, that such trustees should be allowed the rent of certain real estate, to be turned over by the executors of the estate in which the trust was created to the trustees thereof, from the preceding April twenty-sixth, and be responsible for the repairs made thereon after the preceding April twenty-sixth.

*Held*, that such contract was binding, and would not be disregarded upon an accounting had between the parties.

The trustees of a trust fund are entitled to commissions on that portion of the income of the trust fund which was paid directly to the *cestui que trust* under an agreement between the trustees and the *cestui que trust*, which contained the provision "that with reference to all questions affecting the trusteeship of said trustees and the settlement of their accounts, the receipts and expenditures of the said property from the 1st day of May, 1873, shall be regarded as passing through their hands."

It is the general rule that interest on a general pecuniary legacy begins to run one year after the granting of letters testamentary or of administration, unless there is a specific direction in the will that the legacy be paid at an earlier date, in which event interest commences to run from the date fixed by the testator for the payment thereof. When, however, a legacy is given to a widow in lieu of her dower, interest will commence to run upon the same from the date of the testator's death, unless it appears that it is contrary to the intention of the testator, in which case interest will not commence to run thereon until one year after the granting of letters upon his estate.

A judgment which awards a widow interest on a legacy, given to her in lieu of dower by her husband's will, from the time of his death, will not, upon appeal, be modified in that respect on the ground that interest thereon should only commence to run from the time she signified her intention to accept the legacy in lieu of dower, when no such proposition was before the court upon the trial of the action wherein such judgment was rendered and when that court did not attempt to pass upon the question.

CROSS-APPEALS by the plaintiffs, Charles G. Stevens and another, trustees of Marietta R. Stevens, and by the defendants, John L. Melcher and others, as executors, etc., of Paran Stevens, deceased, and others, from a judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 15th day of November, 1891, upon the report of a referee in an action brought for an accounting by the trustees named in the will of Paran Stevens, deceased, with the executors named in such will, the *cestui que trust* and all others interested therein.

*George Hoadley*, for Marietta R. Stevens.

*George Zabriskie*, for executors and residuary trustees.

*John S. Melcher*, for Ellen S. Melcher.

*M. S. Burrill*, for Trustees Stevens and Richardson.

PARKER, J.:

The will of Paran Stevens, out of which this litigation grows, was executed July 10, 1869, and admitted to probate shortly after the testator's death, which occurred April 25, 1872.

Such portions of it as are essential to a consideration of the questions presently to be discussed will now be stated.

The first clause contains a bequest to the testator's wife, Marietta R. Stevens, of $100,000. " To be paid to her out of my estate as soon as practicable after my decease."

The fifth clause contains among other provisions the following:

" I give and devise unto Charles G. Stevens, of Clinton, in the State of Massachusetts, and George F. Richardson, of Lowell, in said State, and to the survivor of them, the sum of one million dollars, in which sum, however, shall be included at their fair value at my decease the premises known as No. 1 store, State street block, on

State street in the city of Boston, Massachusetts, now held in trust by said Charles G. Stevens: In trust nevertheless to hold, invest and manage the same as a trust fund and estate for the benefit of my said wife during her natural life, and to collect the income and receipts therefrom, and pay the same over to my said wife into her own proper hand, and upon her sole receipt, and upon her decease to divide the principal of said fund and estate among my children in equal proportions, the issue of any deceased child to take the share their parent would have taken, if living."

The testator left him surviving his widow, Marietta R. Stevens, and three children, Ellen S. Melcher, Mary Fiske Stevens, since intermarried with Arthur F. Paget, and Henry Leiden Stevens, who died in the year 1885 without issue, but leaving a will.

Other provisions of the will of Paran Stevens preceding the eleventh clause gave certain legacies, which are not of moment in this controversy, and, therefore, need not be referred to, but the last-named clause directed in effect that the rest, residue and remainder of his estate, real and personal, should be divided by his executors into three equal parts. One of these parts he gave to Charles G. Stevens and George F. Richardson in trust for his daughter Ellen, wife of John L. Melcher, for life with remainder over after her decease to her children, including her husband, for life. In case there should be no descendants of Ellen, then one-half to the testator's widow, if living, but if not, the whole to go to the persons who are ultimate remaindermen under the fifth clause.

The twelfth clause gave another of the said parts to trustees in trust for the benefit of Mary Fiske Stevens for life, with remainder to her issue, or in the event of a failure of issue, then to his daughter Ellen and son Henry and their descendants.

This clause contained further provision that in case there should be no descendants of the testator then living, one-half of the principal fund should go to Marietta R. Stevens, and, in case of her death, the whole to go to the remaindermen under the fifth clause.

The thirteenth clause gave the remaining one-third of testator's estate to trustees, in trust for the benefit of Henry Leiden Stevens, with direction to apply so much of the income as should be necessary for his support and education during minority; after which, and until he should be twenty-five years of age, to pay the entire

income to him; and at the latter period to pay to him the whole of the principal sum and accumulations, except $400,000, which they were directed to keep invested for his benefit during his natural life, unless the principal of the son's share of the residuary estate should amount to less than $400,000, in which case they were directed to pay him $100,000 upon his becoming twenty-five years of age. At his death the principal was given to his children, or if he should leave no descendants surviving him, then to testator's daughters Ellen and Mary and their descendants. In the event of there being no descendants of testator living at such time, then to Marietta R. Stevens and the ultimate remaindermen under the fifth clause of the will.

The fourteenth clause authorized the executors to make conveyance to the trustees of the several trust funds, in order to divide the estate and to erect the several trust estates, and it further authorized the trustees of the trust estates and their survivors " to sell, convey and make, execute, acknowledge and deliver all proper and necessary deeds of conveyance, of any and all real estate that may at any time form part of such trust estates," and to reinvest the proceeds in other real estate, or United States, city or State securities upon the same trust.

The fifteenth clause directed that the income of the several trust estates should not be paid in anticipation, but only after it has accrued and been received by the trustees.

By the seventeenth clause Marietta R. Stevens, John L. Melcher and Charles G. Stevens are appointed executors and specially empowered " to carry into effect all and any agreements contained in the different partnership articles I may have entered into, or may hereafter enter into in partnerships existing at the time of my decease, and particularly to retain in such partnerships such part of my estate as may be invested therein, until the end and the determination of said partnerships respectively, and collect the share of the profits and income thereof belonging to me or my estate, for the benefit of said estate, and to form part thereof; or, when best for the interest of my estate, in their opinion, to withdraw from said co-partnerships or any or either of them, and close and wind up the same, or dispose of my interest and property therein, upon such terms as they shall deem most proper; and I invest them with all

the rights, powers and authority in me vested under or by virtue of said co-partnership articles, any or either of them."

The eighteenth clause declared that, " The provisions herein made for the benefit of my said wife are to be, and are to be accepted by her, in lieu and stead of all dower and thirds and right of dower and thirds in my estate."

Before the widow elected to take under the will a suit was brought in this court for a construction of it, which resulted in an adjudication that the will authorized the executors to retain the hotel interests, and continue the portion of the estate invested therein, if they should elect so to do.

He had a ten-twentieth interest in the firm of Darling, Griswold & Company, proprietors of the Fifth Avenue Hotel, in the city of New York; six-sixteenths in the firm of Wetherbee, Chapin & Company, as proprietors of the Revere and Tremont houses, in the city of Boston, and seven-sixteenths in the firm of J. E. Kingsley & Company, as proprietors of the Continental Hotel, in the city of Philadelphia.

These hotel interests the court found yielded a very large income in proportion to their pecuniary value, greatly in excess of the income of any real estate of Paran Stevens. And it was decreed that should the rest of the estate meet the other requirements of the testator's will and codicil, that such hotel interests " should be held by them for the benefit of his residuary estate, which, by the terms of his will, is divided into three parts in trust respectively for the benefit of his said three children; and that during the lifetime of such children the profits realized from the said hotel interests should be treated as income, and as such, by the terms of his will, go to his said children."

At the time of his death the testator was engaged in erecting the " Stevens Apartment House," at Twenty-seventh street and Fifth avenue, New York, on account of which there was an indebtedness of about $200,000, and it was determined that his personal estate was probably sufficient to pay that and other indebtedness, and all of the specific legacies of the will, except the trust legacy of $1,000,000.

The hotel interests, therefore, could not be retained by the executors, unless under the will the million trust should either be

set up in real estate or enough of the real estate be sold to realize a sufficient sum for that purpose.

The court held that under a proper construction of the will either might be done, and the judgment of the court on that subject reads as follows: "That it was the intention of the said Paran Stevens, by his said will, to permit the trustees of the several trusts thereby created, including the said trustees of the said million of dollars left for the benefit of his widow, the said Marietta R. Stevens, and that it is the true interpretation and construction thereof, and they be, and they hereby are permitted to accept real estate of his estate, to be set apart so as to provide, so far as necessary, for the estate left in trust by him, so that his said executors, by the provisions of his said will, are authorized either to retain or dispose of the said hotel interests, and to satisfy any deficiency in the payment of legacies left by the said will and codicil, caused either by the retention of the said hotel interests or otherwise, from the real estate left by the said Paran Stevens, and that the said executors may either satisfy the same by procuring a sale, so far as necessary, of the said real estate under the charge of the said legacies thereupon, or so far as concerns the million of dollars left in trust for the benefit of his widow, the said Marietta R. Stevens, by conveying the necessary amount of the said real estate to her trustees, at a valuation to be fixed and determined, there being included therein the said premises known as No. 1 store, State street block, on State street in the city of Boston, Massachusetts."

This was followed by a provision referring the cause to a referee to fix and determine the valuation of the real estate of Paran Stevens for the requirements of his will and codicil, and directing that upon the confirmation of the referee's report, the Boston store should be allotted on account of said million trust, the widow to receive the income to be thereafter realized. It further provided for the application to the million trust legacy of any surplus moneys from the personal estate, not including the hotel interests, if the executors should elect to retain them, and not including the personal property specifically bequeathed by said will. "That after providing for all the other provisions of the said will, the said executors may convey to the trustees of the said residuary trust estates created

by the said will, any balance of real estate which may remain at the valuations which shall be thus established, either in divided or undivided interests, as they shall agree."

The report of the referee valued the Boston store at $105,000, and placed a valuation upon each of the other pieces of property which need not be referred to in detail at this point. The report was duly confirmed by a Special Term of this court. The order of confirmation specifically authorized the executors and trustees, after applying the surplus of personalty to the million trust legacy, to set up the rest of it in real estate, agreed upon between them, at a valuation reported by the referee. Subsequently, the executors determined to retain the hotel interests for the benefit of the residuary estate, and Mrs. Stevens elected to take under the will, so it became the duty of the executors to convey to the trustees, if the trust was to be set up in realty, real property valued by the referee at $895,000, being the total sum of $1,000,000, less $105,000, at which the Boston store was valued in the report of the referee.

October 28, 1873, an agreement was entered into between the executors and trustees under the fifth clause of the will and Mrs. Stevens, providing for an immediate conveyance to the trustees on account of the million trust, of the apartment house, Boston store, stable No. 3 East Twenty-eighth street, and Nos. 228 and 230 Fifth avenue, New York. "The said property to apply as of May 1st, 1873, on Mrs. Stevens' trust legacy of $1,000,000, at $550,000 over the mortgages."

The mortgages upon the apartment house and Nos. 228 and 230 Fifth avenue then aggregated $565,000.

No further steps have been voluntarily taken by the executors towards setting up the million trust legacy, and the most important question passed upon by the referee related to the amount remaining unpaid on account of it.

(1) The referee found that " the sum of $33,707.31, paid by the executors to the plaintiffs for the extraordinary repairs on the apartment house, was a payment on account of the principal of the million trust as of the dates when the several items composing that sum were paid."

When the apartment house was set apart to the trustees of the million trust, October 28, 1873, there existed serious latent defects

in the construction of the building unknown to any of the parties to the transaction — defects of such a character as rendered the building unsafe. Indeed they seriously threatened the fall of the building, and made it a menace to the public as well as to its occupants. Knowledge of the defects coming to the building department of the city, formal notice was given that the repairs should be made.

An investigation disclosed that the south wall had been laid on a soft muddy bottom, without sufficient support to prevent it from sinking when burdened with the weight of the superstructure.

Now, the building department having notified the parties that the defect should be remedied and the building made safe, it became necessary for some one to take steps in that direction, otherwise the city had authority to make the repairs, the expense constituting a lien upon the land. The trustees, having no money for the purpose, applied to the executors, who advanced it under an understanding that the question whether the estate, the million trust or the income should be charged with the expense should be left open for judicial determination.

The referee held that it should be charged to the capital of the trust. This Mrs. Stevens insists is wrong ; she urges, and rightly, that the effect of it is to reduce the income and receipts which the testator intended for her benefit and support by more than $2,000 annually, and to such extent is his purpose defeated and his will thwarted. And that such a result is accomplished, if at all, without fault either on her part or that of her trustees. That all were without blame, the executors as well as the trustees and life tenant.

In good faith a conveyance of the property was made to the trustees, at a valuation established by a decree of the court — a decree made in a suit to which all persons interested were not only parties but appeared, and, therefore, it became binding upon them and must so continue so long as it stands without being vacated, modified or reversed.

As to these parties the valuation put upon the apartment house was and is as conclusive as any other part of the judgment.

The trustees could not, in this suit, secure an additional contribution to the trust by proving that the property conveyed was of less value than was decreed, nor could the executors, by furnishing proof that the property was worth a far greater sum, obtain an adju-

dication that they had turned over to the million trust a greater amount than the decree adjudged its value to be.

The executors insist that it has not been shown that the property was worth a less sum than the adjudged value, plus the cost of making the improvements, but that question need not be considered, because it was passed upon in the construction action and cannot now be subjected to another and different determination.

Unless then there was an agreement on the part of the executors to pay the cost of the repairs, or the conveyance contained a covenant broad enough to cover such an expense, there would seem to be no basis whatever for imposing the charge upon the estate.

The correspondence had at about the time the making of the repairs was undertaken shows that the executors did not agree that the estate should bear the expense, and that it was not understood otherwise by the other parties interested. And the deed not only did not contain a covenant of warranty, but absolutely no covenant whatever.

Whether the cost of the repairs should be charged to the capital of the trust or to the income was the remaining question as to this item, and the referee rightly, we think, disposed of it.

There was no obligation on the part of the remaindermen to make the repairs, for remaindermen are not liable to make repairs when not in possession, unless under express agreement to do so. Nor was the tenant for life bound to meet out of her income this compulsory expenditure. Confronted with this situation, and unable to reach an agreement as to the proper party or fund to bear the expense, it was finally understood that the repairs should be made, and that the charge therefor should fall according to their legal rights. This question is submitted to a court of equity, and its proper solution would seem to be to distribute the expense in such a manner as shall require those who receive the benefit to pay the cost.

The remaindermen were benefited, because the expenditure prevented the whole or partial destruction of income-producing property.

The cost should, therefore, fall on both in proportion to their interests, and this is effected by charging the capital with the expense, on the same principle that assessments for permanent

improvements are charged against the capital of an estate. (Lewin on Trusts [9th Eng. ed. 1891], 643; *Ferguson* v. *Ferguson*, L. R. [I. R. 17 Chan.] 552.)

(2) We shall next consider whether the expense incurred in adding at least $90,000 to the value of a portion of the property set up in the million trust, should be charged to the capital of the trust or to Mrs. Stevens individually.

She is charged with $130,000, moneys actually paid out of the funds of the estate for the permanent improvement of the property.

The referee says, in his opinion, "that it is not clear upon the proofs that the building constructed was such as will be a permanent improvement to the amount of $130,000 of the premises when it comes into possession of the remaindermen," but he does find as a fact, that the building, erected at such an expense, "became an important part of the apartment house and largely increased its revenue, and added at least $90,000 to the value at that time of said premises."

It is not clear but that the referee would have been justified in finding that the value of the trust estate was increased in value, equal to the full sum of $130,000 expended upon it, but he has found otherwise, and the counsel for Mrs. Stevens concedes, that because of his finding, she must be personally charged with all the moneys expended in such improvement over and above the $90,000 which the referee finds was added to its value by the expenditure made. The referee found, as a matter of law, in effect that she, and not the trust estate, should be charged with the $90,000, as well as the additional $40,000 expended.

Under the contract of October 28, 1873, there was conveyed to Mrs. Stevens' trustees on account of the million trust, the apartment house, the Boston store, the stable No. 3 East Twenty-eighth street, and Nos. 228 and 230 Fifth avenue, New York, the property to be applied as a payment to the trust of $555,000, leaving payable by the executors, as applicable to the final setting up of the residue of the trust, the sum of $445,000.

The judgment entered upon the report of the referee still further reduces this sum, by charging to the capital of the trust the sum of $15,000, contributed by Mrs. Stevens to the reduction of the Moller mortgage, which covered a portion of the premises; the sum of

$33,707.31, expended in repairs upon the apartment house, which we have already considered; the sum of $125,000 paid in reduction of a mortgage upon the apartment house, held by the Union Dime Savings Bank, and the sum of $5,995.50 expenses incurred in and about such reduction, and in securing a party to take the assignment of the mortgage, leaving still due the trust $265,297.19. As the trust has been permanently benefited to the extent of $90,000, Mrs. Stevens insists that the capital of the trust should be charged with such sum, and it should be paid to her out of the sum remaining to be set up, which is more than adequate for the purpose. Of the property conveyed to the trust, Nos. 228 and 230 Fifth avenue were valued in the order of confirmation in the construction action at $150,000. It is conceded that they were not worth more. Indeed the referee finds that they were only worth from $140,000 to $150,000 at that time. They were incumbered by mortgages aggregating $140,000, leaving an equity in both pieces of property not exceeding $10,000. As a producing property it was a burden, not a help, to the estate.

The referee finds that "one of said houses was at that time badly out of repair, and both together, in the condition in which they then were, were incapable of yielding rent sufficient to pay the taxes and interest accruing on the mortgages on them."

An examination of the executors' account discloses that during the period of one year and six days immediately preceding the 1st of May, 1873, the date as of which the property was treated as a part of the million trust, the expense for interest, taxes and repairs on these properties had exceeded the income by $9,573.75.

It is clear, therefore, that had it been the intention of the parties that this property should be set up as a part of the trust, with the expectation that there was to be no money expended upon it in order to enhance its income productiveness, the trust would have been greatly injured. It was a leading purpose of the trust to produce revenue for the benefit of the *cestui que trust*, not to take it away from her. The latter and not the former would have been the inevitable result had the improvements not been made. While this and the other property already described, was conveyed to the trust pursuant to the terms of the agreement entered into October 28, 1873, there was a provisional agreement, made about

May ninth of the same year, to the same general effect, and immediately thereafter the work of tearing down the buildings on these two lots commenced, and in their place was erected a building suitable for use in connection with the apartment house, which adjoined them.

The trustees seek to create the impression that this was done by Mrs. Stevens against their advice. And notwithstanding the demonstrated wisdom of the expenditure and their shortsightedness, if such was the case, they are found insisting that the capital of the trust should be enhanced in value to the extent of $90,000 at her personal expense, and she treated as one who has improvidently expended her own money upon the lands of another. That justice will be fully done, and only done, by charging the million trust rather than her, to the extent that the property has been actually improved for the benefit of the remaindermen, is too clear to admit of discussion.

Whether, within the rules established by courts of equity, these moneys, which were originally contributed for the purpose, out of the funds of the estate, with the knowledge of all the executors, can be charged to the capital of the trust instead of to Mrs. Stevens individually, we will now consider. In passing to that question we may briefly refer to the evidence in support of the assertion that the money was contributed from the estate with the knowledge of the executors, touching the purpose for which it was to be used.

The active executors were Mrs. Stevens and Melcher, the husband of the only remainderman, who objects to charging the capital of the trust with the sum in question.

Immediately after making the provisional agreement of May ninth, the work of tearing down the buildings was commenced, and a few days thereafter, about May twenty-fourth, the agreement with the contractor for the erection of the new building was entered into. Melcher actively superintended the work of tearing down the buildings and the construction of a new one. That he promised to furnish from the estate funds necessary to do the work appears not only from the testimony of Mrs. Stevens, but also from a letter written by him to her. The letter was written July eleventh, some little time after the contractor had commenced to put up the structure. In it he said : " What is the use of your fretting your

life out about money matters. All the money needed shall be provided and shall be forthcoming when needed, only it is not necessary to provide it before it is needed. You have nearly a year before you before the addition must be paid for, and a little money will keep contractors along; do not fret, for I pledge you I will find it and not sacrifice property. \* \* \* If we get the rent, $48,000, and the balance beyond mortgage on 1170, $40,000, with what money you have, it will pay all the extension and allow us time to negotiate on Forty-fourth street."

The moneys were, in fact, furnished as he promised, and the question now is, whether the entire sum shall be charged against her, or $90,000 of it to the million trust?

It may be observed that the legacy given to her by the will was $100,000, so that if she be personally charged with the entire amount the expenditure will exceed the bequest to her by $30,000.

*Ford* v. *Knapp* (102 N. Y. 135), while not a case in point, may be profitably considered, because it manifests the tendency of courts of equity to make those do equity who seek its aid.

In that case defendants were tenants in common with W. in a mill property. The interest of W. was sold on a judgment against him, and bid in by defendants. After such purchase defendants expended large sums in repairs and improvements, thereby restoring the property to its original usefulness, and greatly increasing its value. Thereafter plaintiff, as a subsequent creditor of W., redeemed and brought an action for partition, and the property was sold under the judgment therein.

It was held that the co-tenant, out of the actual occupation, having asked aid of a court of equity for partition, was entitled to relief only on condition that the equity should be taken into account, and that the defendants were entitled to an allowance out of the proceeds of sale for the enhanced value of the property resulting from the repairs and improvements. The court distinguished *Scott* v. *Guernsey* (48 N. Y. 106), cited on this appeal, and in the discussion employed language so entirely applicable to this situation that a brief quotation from it will not be out of place.

" To a share of that increased value neither the debtor nor his creditors have any equitable right. They never earned it nor paid for it. If the redeeming creditors get the full one-half of the value of

property as that value exists, unincreased by the improvements, they get every dollar to which they have a just and equitable right. The rule which takes from one co-tenant the fruit of his thrift and enterprise, and adds it to the unthrift and neglect of the other; which loads upon industry and ability the losses and burdens of idleness or ill-fortune; which ties up property from improvement, and looks contented upon rot and decay, is a rule which sometimes the rigid and inelastic jurisdiction of a court of law may adopt from necessity, but is without excuse in a court of equity in which this action is pending."

In this case there is present a basis on which to work out this undoubted equity in favor of Mrs. Stevens, provided the trustees had legal power under the will and the judgment in the construction action to increase the trust fund by building upon property set apart for the purpose of establishing the trust.

The trustees made a contract for the erection of the building, and the contractor was paid by moneys furnished by the executors out of the estate, with full knowledge on the part of all of them that it was being applied to such purpose, and of that fact the trustees were also informed. Some effort has been indulged in to avoid the effect of the pregnant fact that the trustees were parties to this contract, by insisting that their legal relation was otherwise, because of a guaranty indorsed upon the contract and executed by Mrs. Stevens, which reads as follows:

"In consideration that the said Charles G. Stevens and George F. Richardson execute the foregoing contract, and for value received, I agree to make all payments required thereby, and to assume and faithfully perform all their promises and agreements therein set out, to protect, save harmless and indemnify them and each of them from all liability, costs, damages and expenses which they or either of them may incur by reason or on account thereof."

It will be observed that this was a personal indemnity intended for the individual protection of the persons who had been appointed by the will trustees of this trust. There is not a word in it which suggests that it was the intention of Mrs. Stevens, who executed it, that the trust should be indemnified against all liability on account of the contract.

The reason why the trustees insisted upon this personal indemnity is obvious.

It had been provisionally agreed fifteen days prior to the making of the contract, that the property to which it related, together with other property, should be conveyed to the trust in pursuance of the judgment in the construction action.

But the property had not yet been conveyed, nor had the formal agreement therefor been executed, nor was it done for nearly five months thereafter. The title then, not being in the trustees, the ordinary dictates of prudence prompted them to insist upon a personal indemnity. Thereafter, and long before any considerable amount of money had been paid to the contractor, the formal contract of October twenty-eighth was made. A little later, in pursuance of it, the property was conveyed by the executors to the trustees. But, in the meantime, the trustees expressed considerable anxiety because of the expenditure of so much money before the title to the property had become vested in them.

October 2, 1873, Trustee Richardson wrote Mrs. Stevens : " You are expending money in building in connection with the apartment house, and yet I don't know that the trustees have any title to it, never having seen any conveyance. Let us have the deeds made of such of the property as we can."

Six months later he wrote : " I never have seen any deed executed of the lot on which you are putting up your building. I think it is very wrong not to get that done at once. You are investing your money there, and title is not passed. * * * As trustee, I can do nothing ; the executors, of which you are one, must have the conveyance made, and then if the trustees don't do their duty you can properly blame them. See to the conveyance at once."

After the deed was executed the building was completed, and the payments finally made. As it was the trustees' contract, and the moneys which paid for it came from the estate, which still owed the trust a very large amount of money, the capital of the trust should be charged with it, unless the trustees were without authority to erect the building.

The learned referee decided that a court of equity could not allow such an expenditure by the trustees, assigning several grounds as a basis for his conclusion. One was. that, "Serious objection to

allowing the trustees to make the expenditure, which, I think, on the English authorities, should have great force with a court of equity, would have been that the property was already very heavily incumbered by mortgages."

This objection, it seems to us, would have furnished good reason for the refusal on the part of the trustees to accept the property as a part of the trust, but not one for making such improvements as would change it from a burden to a profit to the trust.

Again, he said : " In nearly all the cases where the court has sanctioned similar expenditures, the trustee or life tenant was in possession of a fund of money either resulting from the conversion of a part of the land into money, or of money which was applicable to the purpose of purchasing real estate."

But there was at the time of making this contract, and months later, after the property affected was conveyed to the trustees, $445,000 due from the estate to the trust. Of this large amount, $90,000 could well be expended, provided it added that amount or more to the permanent value of the property, and at the same time increased its annual revenues, as it is demonstrated this expenditure did.

A further ground assigned was that " It is not clear upon the proofs that the building constructed was such as will be a permanent improvement to the amount of $130,000 of the premises when it comes into possession of the remaindermen." This may be so, but Mrs. Stevens does not ask that the capital of the trust be charged with the $130,000 which she expended, but only with the $90,000 which the referee finds as a fact was added to the permanent value of the property by her expenditure. There seems to be no special reason applicable to this situation which should lead a court of equity to refuse to allow this expenditure. If denied at all, it must be on the ground that under no circumstances were the trustees authorized to use the moneys of the trust to erect a building upon trust property.

That position cannot be successfully asserted. Authority was given by the judgment in the construction action to set up the trust fund in real estate. The will confers upon the trustees power to change investments.

And it does not make any difference whether in reinvesting " in

other real estate in the State of New York and Massachusetts," property be purchased which has been improved, or property improved which has already been purchased.

Mr. Perry in his work on Trusts (§ 552) asserts the general rule to be that trustees cannot " raise any sum out of, or make any charge upon, the *corpus* of the estate itself for repairs, however the want of such repairs may be occasioned."

This rule has been so far modified that the power of the court to charge upon the capital of the trust estate a sum compulsorily expended, and first the subject of discussion in this opinion, has not been questioned.

Mr. Perry in the same section observes an exception in these words : " But where trustees are directed to purchase or invest in real estate, they may put such estate in tenantable repair, and the expense of such repair will be chargeable to the trust fund as part of the purchase money."

Lord Chief Justice JAMES, *In re Newman's Settled Estates* (L. R. [9 Ch. App.] 681–683), says: " The cases proceed on the principle that the erection of a building is substantially the same thing as the purchase of a new estate."

The same judge in a later case, *Drake* v. *Trefusis* (L. R. [10 Ch. App.] 364–366), said : " That the expending money in building a house on a vacant piece of ground, forming part of the settled property, is in substance the same thing as buying a house."

The earlier English cases were generally in accord with the rule asserted by Mr. Perry (*supra*), but latterly their tendency has been in the other direction, the more recent cases agreeing that power to invest and reinvest in land implies power to build and to rebuild dilapidated and ruinous structures, when the trust estate will be substantially benefited by the expenditures.

A review of the cases will not be indulged in, but some of them can be cited. (*Hibbert* v. *Cooke*, 1 Sim. & St. 552; *Caldecott* v. *Brown*, 2 Hare, 144; *Bridge* v. *Brown*, 2 Younge & C. Ch. R. 181; *Bowes* v. *Strathmore*, 8 Jur. 92; *Hood* v. *Bridport*, 16 id. 560; *In Matter of Davis' Estate et al.*, 3 De G. & J. 144; *In re Barringtor's Settlement*, 1 Johns. & H. 142; *Dent* v. *Dent*, 30 Beav. 363; *In re Dummer's Will*, 2 De G., J. & S. 515; *In re Johnson's Settlements*, L. R. [8 Eq. Cas.] 348; *In re Lord Hotham's*

*Trust*, 12 id. 76; *In ex parte Rector of Shipton-under-Wych-wood*, 19 Wkly. Rep. 549; *Frith* v. *Cameron*, Id. 886; *In Pearson's Trust*, 28 L. T. 57; *In ex parte Rector of Claypole*, L. R. [16 Eq. Cas.] 574; *In re Newman's Settled Estates*, L. R. [9 Ch. App.] 681; *Drake* v. *Trefusis*, 10 id. 364; *In re Lee's Trust*, 32 L. T. 296; *In re Speer's Trusts*, L. R. [3 Ch. Div.] 262.) Among the cases cited contra are *Green* v. *Winter* (1 Johns. Ch. 26); *Bellinger* v. *Shafer* (2 Sandf. Ch. 293); *Hassard* v. *Rowe* (11 Barb. 22); *Copley* v. *Harlow* (57 id. 299); *Dickinson* v. *Conniff* (65 Ala. 581); *Scott* v. *Guernsey* (48 N. Y. 106). The latter case was distinguished in *Ford* v. *Knapp* (*supra*).

In the case of *Scott* v. *Guernsey* (*supra*) the court found that the improvements were not made by trustees having the legal title, with moneys of the trust estate, but were made under a special agreement with the tenant for life, the owner of the improvements receiving before the termination of the life estate full compensation for his expenditures.

Under these circumstances it was held that the improvements drew with them no equitable right to compensation.

In *Green* v. *Winter* the court refused to allow the trustees for expenses incurred in improving the trust estate by erecting a house, building mills and clearing land, although done in good faith, upon the ground that the expenditure was not within the provision of the trust, which only authorized the trustees to sell land to raise money to make the payments provided, and to preserve the residue of the estate. It was found as a fact that the expenditures were of no real or substantial value to the trust property. The court remarked that to permit the trustees to wander or deviate from the terms of the trust would be creating a most dangerous precedent.

In *Bellinger* v. *Shafer* L. and his wife conveyed a farm to trustees for the support, maintenance and education of his grandchildren. The father of the beneficiaries, with the trustees' consent, and while their tenant, made permanent improvements on the farm. The court refused to charge the cost of the improvements upon the trust estate, holding that the trust authorized nothing of the kind.

*Hassard* v. *Rowe* was not a case of a trust; there a guardian advanced money to erect buildings upon the land of his ward, and

it was held that, in the absence of an order of the court authorizing the expenditure, he was without authority to apply the moneys of his ward to any such purpose.

*Copley* v. *Harlow* was also a case between guardian and ward. The leading facts were, in the main, like those in the case last cited, and the result was the same.

In *Dickinson* v. *Conniff* the proposition was distinctly asserted that a trustee may make necessary repairs and should always be reimbursed for necessary improvements, rendering permanent benefit to the trust estate, unless prohibited by the terms of the trust.

In *Cogswell* v. *Cogswell* (2 Edw. Ch. 231) the city of New York, in widening a street, took off ten feet from lots, which testator had given for life with remainder over. The effect of it was to demolish four buildings and at the same time make the lots valuable as sites for warehouses. The court required new buildings to be erected out of the residuary · personalty in place of the ones destroyed, the tenants for life to pay insurance and taxes and allow for ordinary repairs out of rents, and thus to receive the net rents.

In *Labatut* v. *Delatour* (54 How. Pr. 435) the complaint was demurred to. It alleged, in substance, that certain lots with the buildings thereon had been devised in trust to receive rents, pay the taxes, insurance and repairs, and apply the surplus to Joseph Delatour. That since the creation of the trust the buildings had been demolished and removed pursuant to the direction of the department of public buildings, which asserted that they were dangerous. The relief asked for was, that the trustee be authorized to lease for a term long enough to justify the tenant in building, with a provision to reimburse him at the expiration of the term, or to grant a further term without compensation. The court overruled the demurrer.

In *Parsons* v. *Winslow* (16 Mass. 361) the trustees were directed to purchase or invest in real estate. They expended a considerable sum of money in putting a portion of the trust estate in tenantable repair, and it was held that the expenses of such repair were properly chargeable to the trust fund.

*Sohier* v. *Eldredge* (103 Mass. 345). Two wharves out of repair were devised to trustees to produce income for the life of A., the

remainder to B., with power to change investment. A very large amount of money was expended in the repair and reconstruction of the wharves. It was claimed that the trustees had exceeded their authority.

A portion of the opinion is so applicable to this situation that we quote it: "It appears to us, however, that the question whether these expenditures are chargeable to the principal or to the income of the residuary fund depends upon the terms of the will from which the trustees derive their authority, rather than upon any of the general rules of law as to the right of a tenant for life to charge expenses of that kind in whole or in part to the inheritance. * * *

" If among the various modes of changing and reinvesting any part of the trust property, the trustees should see fit to purchase other real estate, they could lawfully do so. They would have an equal clear right by judicious and proper improvement to increase the value and productiveness of estates already in their hands. It is not claimed that the outlay which they have made was injudicious or unreasonable, and it does not seem to be denied that it has increased the value of the wharves to the full extent of the amount expended. If so, how can it be anything more or less than an investment in real estate such as this will authorized them to make."

It would be a most absurd result if the court were obliged to hold that under this will, and the judgment in the construction action, the trustees could accept as part of the trust real estate burdened with mortgages, the interest upon which, together with taxes, insurance, assessments and ordinary repairs, far exceeded its gross income, and yet would be without authority to use trust funds for the purpose of making such improvements as would result in an annual profit, instead of an annual loss. The authorities do not require the court to so decide. Under this will it was clearly within the power of the trustees to make such improvements as they in fact contracted for, and to be allowed at least such portion of the sum expended as added to the permanent value of the trust. In view of their contract, therefore, and the fact found by the referee that the value of the property was increased at least $90,000 by the expenditure made, that sum should have been charged to the capital of the million trust and not to Mrs. Stevens personally.

(3) By an instrument in writing dated September 1, 1872, the

apartment house was leased to Mark M. Stanfield for a period of ten years, the trustees of the million trust legacy, Henry Leiden Stevens, individually, Alfred Paget and Henry Leiden Stevens, as trustees for Mary Fiske Paget, and Marietta R. Stevens joining in the lease. The other remainderman, Mrs. Melcher, refused to join in its execution, although the lease was a most advantageous one, securing to the trustees an annual income of $70,000 instead of the insignificant sum which the property had netted to them each year during the nearly seven years that it had constituted a part of the million trust.

By its terms the lessee was authorized to make certain repairs in the nature of permanent improvements. This he subsequently did, expending for that purpose at least $75,000. In order to induce Stanfield to lease the property, Mrs. Stevens purchased at the price of $41,800 a lot of land, known as 1146 Broadway, immediately adjoining the apartment house, on a part of which is the dining room which is used in connection with the apartment house, and all together at present known as the Victoria Hotel.

Mrs. Stevens insists that the decree of the court should in effect say to the trustees, the rent of the life tenant paid for these improvements, and having used the rent in enhancing the permanent value of the trust estate, the trust must reimburse her. The first answer which the trustees make to this contention is, that while the referee has found that the cost of the improvements made by Stanfield was $75,000, he has also found that it was not shown to what extent such expenditure permanently benefited the property. But this finding does not finally dispose of the question, because Mrs. Stevens attempted to show by two witnesses to what extent the property was permanently benefited, and the evidence was excluded upon the objection of the counsel for the plaintiffs. If then there are no other grounds upon which the decision of the referee in favor of the plaintiffs can be sustained, the judgment in such respect would have to be reversed, because of the refusal to receive the evidence offered. But a conclusive answer to her contention seems to be that it does not appear that the improvements were paid out of the rents. The lessee did not bind himself to pay $70,000 a year, and in addition to expend $75,000, or any other sum, in improvements. He was under no obligation to spend a dollar in that direc-

tion. He insisted merely that he should have the option to make improvements in his discretion, and the lease provided for that only. Stanfield testified that the property was not worth the rent which he agreed to pay, and unless the privilege had been accorded to him of making the repairs, he could not have afforded to pay any such rent.

The lease was negotiated in the main by Mrs. Stevens, and the million trust has doubtless been permanently benefited, because of her business foresight, and without any substantial assistance on the part of the trustees and the objecting remainderman. At the same time the result of the negotiations which ripened into the lease has very largely enhanced her annual income, and it is not possible to say, from all the evidence on this subject, that such permanent improvements as were added to the property were in effect paid for out of the rent, which otherwise would have gone to her.

(4) Mrs. Stevens' contention, that the referee erred in applying moneys received by her as executrix in payment of the principal of the $1,000,000 legacy in advance of the interest upon the million trust legacy, under the peculiar circumstances of this case, does not seem to be well founded. In her capacity as executrix she received a large amount of money, and the referee was required to determine whether the moneys in her hands should be first applied in payment of the legacy, or of interest on the unset-up portion of the $100,000 legacy. There was no suggestion that Mrs. Stevens had made any election as to the order of their application. The question, therefore was, how should the law apply them? The referee properly, as we think, reached the conclusion that they should be applied on the legacy to her for the reason which we quote from his opinion : " It seems to me that as she received the moneys in a trust capacity, she should be held to have applied them most beneficially for the estate, of which she was the trustee."

(5) The claim is further made that the referee erred in refusing to find the sixth conclusion of law requested by counsel for Mrs. Stevens, to the effect that the estate is not entitled to charge Mrs. Stevens with interest upon any sums received by and charged to her by two decrees of the Surrogate's Court made in 1876 and 1885,

respectively, pursuant to an account rendered by the executors. That interest could only be computed upon balances found due by said decrees.

This request was prompted by section 2742 of the Code of Civil Procedure, which provides that such a decree is conclusive against all the parties who were duly cited or appeared. "That the accounting party has been charged with all the interest for money received by him and embraced in the account, for which he was legally accountable." But while he refused to find this proposition of law, the finding which he did make, and the decree made in pursuance of it, are not objectionable. The account and the decree taken together disclose the dates and amounts which aggregated the total sum for which he was charged in each of the decrees.

The second decree reserved the question of interest, and, while the first one did not, no attempt was made to adjudicate touching the application of the moneys on account of her legacy or the interest due her.

On this hearing these questions were brought to the attention of the court by the pleadings of the several parties, and the referee, treating the decree of the surrogate as final in respect to the amount of money received by Mrs. Stevens as executrix, held that it should be applied in the payment of the sums due her on account of her legacy, and the interest thereon, and the interest on the unpaid balance of the million trust, as of the several dates when they were received. In this there was no error.

(6) The referee determined that Mrs. Stevens was entitled to interest on the unset-up portion of the million trust at the rate of seven per cent until January 1, 1880, and thereafter at the rate of six per cent. It is urged that the contract of October 28, 1873, fixes the rate of interest to be paid on the unset-up portion of the legacy, and is, therefore, within the protection of the saving clause of the act, which provides that it shall not affect any contract or obligation made before its passage. But, as we read the contract, it does not fix the rate of interest to be paid at seven per cent. It says: "Mrs. Stevens meantime to receive the interest to which she is in law entitled on the unpaid part of her trust legacy." The reasonable construction of this provision seems to us to be that the parties intended to provide that, pending the final payment to

the trustees of the sum required to make the legacy, Mrs. Stevens should receive such interest as the law would award her, which, after January 1, 1880, was six per cent.

(7) The referee charged the entire amount paid for insurance to the life tenant, including the necessary premiums to keep in force policies upon the apartment house amounting to $235,000, which were made payable in case of loss to the mortgagees.

The life tenant insists that as the insurance was effected for the benefit of the remaindermen as well as the life tenant, the expense of it should be apportioned between them. That this would be effected by deducting it from the body of the trust estate so that the life tenant should bear the interest thereon, and the remaindermen should ultimately bear the principal thereof. If this were an open question in this State an interesting proposition would be presented; but we regard it as settled by authority in favor of the life tenant. In *Peck* v. *Sherwood* (56 N. Y. 617) there was a devise of a life estate with remainder to an executor in trust. On the accounting before the surrogate an item was presented for moneys paid in satisfaction of a municipal assessment for flagging the sidewalk in front of the premises. The surrogate apportioned this item between the life tenant and the remainderman. This decision the Court of Appeals sustained. The account also contained items paid for insuring the buildings and for putting lightning rods thereon, amounting to $750. It appeared that these items were incurred by the life tenant. The surrogate refused to apportion the expenses between the life tenant and the remainderman as he had done in the case of the municipal assessment. This the court held was error, and directed that the decree be so modified that a proper portion of the sum paid for insurance premiums, cost of lightning rods and interest, as well as the share of the assessment for flagging and interest, should be borne by the remainderman. This decision is necessarily conclusive unless overruled by later decisions. Our attention has not been called to any case which purports either to overrule or distinguish it. So far as the matter of assessment is concerned, it has been cited with approval in *Thomas* v. *Evans* (105 N. Y. 601). It was cited as authority for the proposition that " it is also the general rule that municipal assessments for permanent improvements upon land are apportionable between the life tenant and the remain-

dermen according to the circumstances of the case and their respective interests in the property."

It is urged that the court has since held otherwise in relation to the cost of insurance in *The Matter of Albertson* (113 N. Y. 434). The result of that decision was undoubtedly to charge the life tenant with insurance premiums paid as well as with the taxes, interest on mortgages and repairs. While such was the effect of the decision, it should be observed : (1) That the counsel for the appellant did not make the point that the law recognizes any distinction between insurance premiums and ordinary repairs and taxes. (2) That the court did not appreciate that the question whether the cost of insurance should be apportioned was involved, is shown by the fact that nowhere in the very careful opinion delivered by the court was the word "insurance" even used. (3) That such was the fact is further shown by the omission of the court to allude to *Peck* v. *Sherwood*, a recognized authority upon that question. (4) The court nowhere purports to lay down any rule touching the liability of life tenants or of remaindermen for insurance premiums.

But what it did undertake to do was to construe a will and determine what expenses the life tenant by reason of its provisions should be required to pay.

It was subsequently cited in *Woodward* v. *James* (115 N. Y. 346), which also involved questions of construction. Whether the life tenant or remainderman, or both, should bear the expense of insurance premiums, was neither before the court nor considered in that case.

It is not suggested that this subject has been specially considered by the Court of Appeals since *Peck* v. *Sherwood* was decided. We are not authorized in holding, therefore, that the authority of that case has been shaken. If this position be correct, it follows that the referee erred in charging the entire sum for insurance premiums to the life tenant.

(8) The referee charged Mrs. Stevens with having received, on account of her income on the million trust legacy, certain items of hotel capital and profits. These items came to her in her capacity as executrix and are embraced in the surrogate's decree of 1885. They are as follows :

| | | |
|---|---:|---:|
| " 1875, March 6, Darling, Griswold & Co., profits | $7,000 00 | |
| " 1876, Oct. 6, Darling, G. & Co., profits | 14,000 00 | |
| " 1877, Jan. 3, Do | 2,697 92 | |
| " Total profits | | $23,697 92 |
| " 1879, Jan. 1, cash notes of H. Hitchcock | $23,500 00 | |
| " 1879, March 19, cash from H. Hitchcock | 23,847•00 | |
| " Total | | 47,347 00 |
| " Total of all the items | | $71,044 92 |

The decree expressly reserved for further adjudication all questions relating to the application of the proceeds to the $100,000 legacy and the million trust legacy.

The referee finds, as a fact, that the moneys paid by Hitchcock, being in all $47,347, were for two shares of the capital stock of the Fifth Avenue Hotel sold to him by Mrs. Marietta R. Stevens, as executrix, and that the three sums first mentioned were paid on account of the profits of the business of the Fifth Avenue Hotel.

By the terms of the judgment in the construction action, the executors were authorized, if they should so elect, to treat the principal of the hotel interests as belonging to the trustees of the residuary estate and to pay the profits to the legatees or *cestuis que trust* of· such residuary estates.

It was contended before the referee that in view of these facts the estate was not entitled to demand of Mrs. Stevens that she turn over to the executors thereof such moneys. That should she make payment, even in pursuance of a decree in this suit, it would not protect her should an action be brought by the trustees of the residuary estates to recover the amount received on account of the principal of the hotel interests, nor from a suit brought by the *cestuis que trust* of the residuary estates for the items of income.

The record shows that the executors of Henry Leiden Stevens, one of the residuary legatees, commenced a suit which is still pending

to recover these moneys from Mrs. Stevens and the executors of Paran Stevens.

The referee, however, found that these sums were applied by Mrs. Stevens "to her own use in payment of her legacy of $100,000 and interest thereon, and of interest on the unpaid portion of the million dollar trust legacy, and are included in the amount charged to her, and found to have been so used, in and by the decree aforesaid of December 5, 1885."

In making this finding, the referee apparently overlooked the express terms of the reservation in such respect, contained in the decree, to which we have already referred.

But this error is of no practical moment, as the reservation left the question open for adjudication, and by this and other findings it was determined that there was due to the estate from her the amounts received on account of the profits and principal of the hotel interests. Apparently appreciating the injustice which would result to Mrs. Stevens, should the trustees of the residuary estates, and the *cestuis que trust* of such estates, prosecute suits against her to recover such sums, he attempted to secure to her some measure of protection by directing that the judgment should contain a reservation which reads as follows: "Nor shall this judgment in any way prejudice the right of the said Marietta R. Stevens in case she shall be compelled, in obedience to the judgment of a court of competent jurisdiction, to refund to parties interested in or under the residuary trusts created by said will any part of such moneys so charged to her, and which were the proceeds or income of hotel properties, to resort to the estate of said Paran Stevens for the reimbursement thereof, nor the right of any party (if such there be) so entitled to claim the same to be subrogated to her claim and lien against the real estate of said testator other than such as may be sold for the purpose of paying legacies as aforesaid to secure the payment of such amounts (if any) as they shall, by such judgment, be adjudged to be entitled to recover from her."

The effect of the decision and reservation as embodied in the judgment was to compel Mrs. Stevens to pay over this large sum of money to the estate (for she was found to have sufficient moneys in hand for the purpose), and, in the event of her being compelled by judgment to turn over such moneys to the parties interested in the

residuary trusts, she secured the right only to get it back in any way open to her. In view of the fact that a suit was and is pending in which the question can be finally disposed of, it would have been but reasonable had the decree also provided for a stay as to such payment for a sufficient length of time to permit the disposition of the matter by a diligent prosecution. While we assent to the contention of Mrs. Stevens that the reservation, in view of the other provisions of the judgment, was not fully adequate to the exigency which prompted it, still, the changed situation caused by the modification now to be made in respect to the $90,000 charged to Mrs. Stevens, which should have been charged to the capital of the million trust, makes the reservation clause sufficiently effective. She was charged with an excess of receipts over expenditures' in an amount sufficient to call for the payment by her of the receipts from the hotel properties to the estate. But as it will stand after the modification, there will not be due to the estate anything from her. A modification of the decree in such respect is, therefore, unnecessary.

(9) Complaint is made that the provision of the contract of October twenty-eighth, dating its effect back to April twenty-sixth and May first, was improvident, illegal and not sustained by any prior agreement. It provided that Mrs. Stevens' trustees should be allowed for the rent of the property from May first, to be responsible for repairs made after April twenty-sixth, the property to apply, as of May first, on Mrs. Stevens' trust legacy of $1,000,000, at $555,000 over the mortgages. It appears from the findings of the referee that the expenditures on the apartment house exceeded the receipts by $748.02; that the unearned premiums of insurance were $3,630.24, and the repairs made by the executors after the twenty-sixth of April amounted to $7,106.30.

These sums the referee charges against Mrs. Stevens' interest on the million trust legacy. But this does not measure the extent of the loss sustained by her by reason of the provision of the agreement complained of. She lost, in addition, the interest on $450,000 for a period of nearly six months, that being the sum at which the property was conveyed to the trust, plus $105,000, the value of the Boston store. In connection with his discussion of this question, counsel calls attention to two exceptions taken to the refusal of the referee to admit in evidence two letters, written by the executor

Melcher to Mr. Parsons, the counsel for all of the parties, shortly before the execution of the contract of October twenty-eighth. It is urged that the letters were competent evidence to show that prior to the twenty-eighth day of October there was no agreement binding upon Mrs. Stevens to take the property, burdened with its relation, back to April twenty-sixth, in one respect, and to May first in all others. If it should be assumed that the letters were competent evidence of the fact which they were offered to prove, still, as we shall show a little later, they could not have had the effect of producing a different finding than that made by the referee. For that reason the question of their admissibility need not be considered. Before referring to the fact which supports the decision of the referee in sustaining this provision, it may be said that the informal agreement touching the transfer of the real estate to the million trust was made May 9, 1873. It consisted of a letter from Mr. Parsons, the counsel of all the parties, to Mrs. Stevens, advising her of the basis upon which the executor, Melcher, would agree to convey the real estate subsequently conveyed to the trust, and advising her to sign the memorandum and give it to Messrs. Richardson and Stevens, the trustees of the million trust.

This she did; the memorandum signed by her reads as follows: "Messrs. Stevens & Richardson, as my trustees, will please arrange as above." Below this indorsement Trustee Richardson wrote as follows : " To make up the balance of her trust property Mrs. Stevens may take other property at the appraisal instead of having a sale, her election to be made within 10 days."

The formal contract embodying this arrangement between the parties was not executed, it is true, until October twenty-eighth following, but the parties to it took immediate action under this informal agreement.

On the basis of it, and under the guidance of Mr. Melcher and Mrs. Stevens, the buildings on 228 and 230 Fifth avenue were at once torn down, and as early as May twenty-fourth the contract was made for the erection of new buildings, which has already received some consideration. But, assuming that the contract of October twenty-eighth represented the first and only agreement between the parties touching the conveyance of the property to the trust, we are unable to discover any basis upon which the referee could have

rested a decision that the provision that it should take effect as of May first was illegal. From Mrs. Stevens' standpoint it turned out to be unwise.

Indeed, it was unfortunate for her that an effort was made to set up the trust in real estate. But the agreement was not made between the trustees of the million trust and the executors of the estate alone.

She was a party to it both individually and as executrix, and necessarily approved of and agreed to all its provisions. Notwithstanding this fact, it is insisted that she is not bound by it; that her act amounted only to an attempt at ratification of the contract made by the trustees; and that within the authority of *Adair* v. *Brimmer* (74 N. Y. 539) it became necessary for the trustees to show that she knew the facts and her legal rights in the premises; that this is not shown by proving that she consulted Mr. Parsons, because he was also the adviser of the trustees and the executors.

Without pursuing further the argument of counsel, it may be said that its foundation is defective, in that it necessarily assumes that Mrs. Stevens' act, at most, amounted only to a ratification of the wrongful conduct of her trustees. To ratify is to sanction an act already done. In a legal sense, it means that a party having knowledge of a defect in an act done, and of his right to ratify or reject it, concluded to confirm it.

In such a case the rule is that a party relying upon a ratification of his neglectful or wrongful act to protect him, must show that it was made with full knowledge of all the material facts and circumstances. And when the party sought to be affected is a *cestui que trust*, as in this case, it is also necessary to show that she was fully apprised of the effect of the acts ratified, and of her legal rights in respect thereto.

Had the trustees made this contract without reference to the wishes of the *cestui que trust*, and were now relying upon evidence tending to show that she had confirmed the act which has resulted not very favorably to her, the rule would apply. But that is not this case. No step was taken leading to the acquisition of this property by the trustees as part of the million trust that she did not advise. From the moment that it was informally agreed that the property should be conveyed she pushed on the improvements.

Five months before the formal contract was executed, under her direction, and with the approval of Melcher, the buildings were torn down on two of the lots, and the erection of new ones commenced. She was steadily in advance of her trustees, guiding at times their uncertain and faltering steps with sharp jerks upon their leading strings. While she blundered in consenting that the million trust be set up in real estate, she has made no other mistakes in relation to it. A property which, for a number of years, yielded not a dollar of net income, has, through her foresight, persistence and courage, become not only income-producing property, but of very largely enhanced pecuniary value.

But the trustees are entitled to but little credit for it. The idea of the improvements did not originate with them. When the plans were presented to them 'by Mrs. Stevens they universally opposed them, and " advised her " that they be not carried out. In the end, however, fortunately for the million trust, they invariably yielded. Not that they were quite convinced, but rather that it was easier to yield than longer attempt to meet the arguments with which their position was assailed.

But, as a condition of final surrender, they always insisted that Mrs. Stevens should be a party to the contract, and assume her full share of the responsibility undertaken against their advice. This she unhesitatingly assented to at all times, and, so far as the record discloses, erred but once.

The contract of October twenty-eighth was her contract as much as theirs. If it ratified anything it was the informal agreement of May ninth, but to that Mrs. Stevens was also a party. She did not attempt to ratify, but to contract with and through her trustees, and is bound by her act.

The reasons given for the disposition made of this question, together with the decision of this court in _Stevens_ v. _Melcher_ (6 N. Y. Supp. 811), justify a decision, without other discussion, adversely to Mrs. Stevens' contention that the contract of October 28, 1873, was in excess of the authority committed by law and the will of Paran Stevens, and, to the extent of such excess, has been illegally acted upon and enforced.

(10) The referee's ninetieth finding of fact justifies his conclusion of law that Mrs. Stevens, as executrix, is not entitled to commis-

sions. And, after an attentive examination of the evidence, we are convinced that within the rules which govern this court in reviewing the findings of fact of a trial court this finding cannot be reversed.

It is strongly urged by the *cestui que trust* that the referee erred in his allowance of commissions to the trustees of the million trust. But the findings of fact of the referee touching the manner in which they have discharged their duties as trustees justifies an allowance to them of such commissions as the law provides. An examination of the manner in which the commissions were computed by the referee satisfies us that the law was accurately complied with.

We have not omitted consideration of the contention of Mrs. Stevens, that the trustees should not have been allowed commissions upon receipts from the apartment house between May, 1873, and October, 1879, which passed directly to her, and were never in the actual possession of the trustees. But we are of the opinion that the agreement under which she obtained the right to personally receive and disburse the income of the apartment house during that period, justified an allowance of commissions to them on such receipts and disbursements. There are several provisions of the agreement which have a bearing upon this question. Reference will be made to but one, which reads as follows : " That with reference to all questions affecting the trusteeship of the said trustees and the settlement of their accounts, the receipts and expenditures of the said property from the 1st day of May, in the year one thousand eight hundred and seventy-three, shall be regarded as passing through their hands."

(11) The executors and residuary trustees seek a review of the referee's fourteenth conclusion of law, which holds that Mrs. Stevens is entitled to interest on the $100,000 legacy from the death of the testator.

It is the general rule that interest on a general pecuniary legacy begins to run one year after the granting of letters testamentary or of administration. (*Matter of McGowan*, 124 N. Y. 526.)

The reason for it is that the statute provides, in effect, that such legacies shall not be paid until after the expiration of one year from the time of granting letters, and as a legacy is not payable until such time, interest will not commence to run until then, unless there

is a specific direction in the will that the legacy be paid at an earlier time. In such event interest commences to run from the date fixed by the testator for payment thereof. The other exceptions to the rule have grown out of facts from which the courts have presumed an intent to have interest paid from the death of the testator.

Infants towards whom a testator stands in *loco parentis*, and for whom no other provisions are made for maintenance during the year, constitute one exception. (*Brown* v. *Knapp*, 79 N. Y. 136.)

Where the only gift to a particular legatee is the income of a fund, constitutes another exception. (*Matter of Stanfield*, 135 N. Y. 292.)

And still another exception is when a legacy is given to a widow in lieu of dower. The reason originally advanced in support of this exception was, that by the giving of the legacy the dower of the widow is purchased, and as the income of one-third of the property accrues to her upon the death of the testator, it is presumed, in the absence of anything manifesting a contrary intent, that the testator intended that the purchase should take effect as of the date of his death. (*Williamson* v. *Williamson*, 6 Paige, 298.)

Now, it is true, as suggested by the counsel for the executors, that in the cases which we have cited as illustrative of exceptions to the general rule, and in the many others which might be referred to, the court examined the entire will and the circumstances surrounding it, for the purpose of ascertaining what the testator's real intention was.

As to the third exception, where a will manifests an intention on the part of the testator not to have interest paid until after a certain period or the happening of some *event, the facts, which ordinarily support the exception to the general rule, will be deemed overborne.

So in this case if from the will it appears that the testator did not intend that this legacy should bear interest from the date of his death, then it is not within the exception, but is governed by the general rule. But examine the will ever so closely, and there will not be found in it an expression which suggests that the testator desired payment of interest to be postponed, and this fact requires the court to hold that he did not intend the legacy to be without the protection of the exception.

Our attention is called to *Matter of Hodgman* (140 N. Y. 421). That case was not intended to overthrow the doctrine of the case to which we have referred. It was disposed of, on the peculiar facts of that case, without reference to or discussion of the authorities firmly establishing the exceptions to the general rule. Indeed their consideration under the facts before the court would have been a work of supererogation. In that case the testator bequeathed to his widow the sum of $50,000, and devised to her certain real estate which he declared should be accepted in lieu of dower. She was appointed one of the executors, and about a year and four months after the issue of letters testamentary, received stocks, bonds and money equal to $50,000, and gave to her co-executors a receipt for it.

Some ten years later she demanded that the executors render an account of the amount of dividend received upon the stock transferred to her in payment of her legacy, and pay the same to her, or, if regarded as a general legacy, that interest thereon be paid to her for the time which elapsed between the death of the testator and the transfer of the stock to her. These facts called for the judgment pronounced by the court. "She accepted the principal in full of the legacy without claim of interest, and as that was not given by the will, and was chargeable, if at all, only as damages for delay, her acceptance of the principal excludes the right, more than ten years later, to demand the interest."

We think the exception is not well taken.

(12) *Duclos* v. *Benner* (136 N. Y. 560) is cited by the executors as authority for the proposition that until Mrs. Stevens made her election to take under the provisions of the will, she was not entitled to interest on her legacy, and her election, when made, did not relate back. In other words, that for so long as she postponed her election she waived her right to interest. No other case was cited in support of that position, nor do we think could have been. We shall not attempt a review of *Duclos* v. *Benner* for the purpose of showing its applicability to the present case, but shall content ourselves with the remark that no such proposition was before the court, nor did it attempt to pass upon it.

The judgment should be modified.

1. By deducting $90,000 from the amount charged against Mrs. Stevens and charging the same to the capital of the million trust.

2. By deducting from the sum charged against Mrs. Stevens. the several amounts paid to secure insurance on the buildings belonging to the million trust and charging the same to the capital of the trust.

3. By striking out the tenth adjudication in the judgment.

4. By striking out the eleventh adjudication in the judgment.

5. The twenty-third adjudication in the judgment should also be modified, in accordance with this opinion.

The judgment as so modified should be affirmed, without costs.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Judgment modified as directed in opinion, and affirmed as modified, without costs.