CASE 18.—ACTION BY W. C. NONES AGAINST J. LITHGOW
SMITH FOR SPECIFIC PERFORMANCE.—October 5.

## Smith v. Nones.

Appeal from Jefferson Circuit Court, Chancery
Branch (1st Division).

SHACKELFORD MILLER, Judge.

Judgment for plaintiff.   Defendant appeals.   Affirmed.

1. Wills—Construction of—Power of Trustee to Improve Estate—
Where one by will devised his estate in trust for his daughter, directing that the trustee could sell any part of it with
the daughter's consent and invest the proceeds in stocks,
bonds, or real estate, and change with like consent said investments from time to time as thought best, and providing
for its descent to her heirs upon her death, and vesting
like large powers with the daughter's consent in the trustee,
the latter, with the daughter joining in the conveyance, had
the power under the will to convey a lot in consideration
of improvements made on a piece of land which connected
it with an important city park, materially enhancing its
value.

2. Same—While the ordinary expense of maintaining an estate
must be borne by the life tenant, yet where the expenditure
is out of the ordinary and enhances the value of the estate
as a whole, the tendency of modern authority is to divide
the outlay equitably between the tenant and the remaindermen.

HUMPHREY, HINES & HUMPHREY for appellant.

1. That a trustee having power of sale and division between
beneficiaries may, instead of selling and dividing the money,
convey the land directly to the beneficiaries is undoubtedly true,
because in this case the beneficiaries have a right to elect to
take the land instead of the money; and it is exactly the same
thing whether the money is divided or the land.   In other words,

if the beneficiaries were to turn over to the trustee checks for a cash conveyance, the trustee would have to turn back these checks of the beneficiaries in the division of the proceeds. Instead of going through this method of circumlocution, obviously the trustee can make a direct conveyance to the beneficiaries. So, also, where a trustee holds property in trust for the creditors of one living or dead, there is no reason why he can not convey the property, or a part of it, for a valuable consideration to such creditors.

## AUTHORITIES CITED.

Hite's Devisees v. Hite's Ex'or, 93 Ky., 260.

HELM, BRUCE & HELM and E. L. McDONALD for appellee.

## POINTS AND AUTHORITIES.

1. When property is devised to a trustee to whom is committed "the entire control over and management of" it, with power to sell the property with the consent of certain beneficiaries, the proceeds to be re-invested upon the same trusts, the trustee has the right to incur indebtedness necessary to the improvement and development of the property, rendering farm land immensely more valuable as residence property, and has the power to convey, with the necessary consent, a comparatively small portion of the property in satisfaction of the indebtedness so incurred. (Gibson v. Gaines, 16 Ky. Law Rep., 475; White v. Glover, 59 Ill., 459; Stokes v. Stokes, 66 Miss., 456; Hughes v. Washington, 12 Ill., 84; Brown v. Farmers Loan and Trust Co., 117 N. Y., 266.)

2. It does not affect the title derived by the purchaser whether the value of the property so conveyed him is charged to the corpus of the estate or to the income, but it would not be improper to charge the whole amount to the corpus, as the services rendered, directly and permanently, increased the value of the whole property. (Hite's Devisees v. Hite's Ex'ors, 93 Ky., 257; Perry on Trusts, sec. 552; Stevens v. Melcher, 80 Hun., 514; Chaplin on Express Trusts, &c., secs. 437, 448; U. S. Trust Co. v. Roche, 116 N. Y., 120; In re Decklemann, 84 Hun., 476.)

3. A bona fide purchaser of such property from the vendee of the trustee, without notice of any fraud or impropriety in the action of the trustee in conveying the property, the deeds showing that it was conveyed for a consideration of $5,000 cash paid, and no notice of the action brought by the guardian ad litem attacking the validity of the title being filed in the county clerk's office as required by Ky. Stats., sec. 2358a, will be protected

against any claims arising out of any such wrongful act of the trustee. (Civil Code, sec. 391; Ky. Stats., sec. 2358a.)

4. The bare possibility that infants may appeal from a judgment affecting the title will not justify a refusal of specific performance of a contract of sale of the property, where there is no probability that on appeal the judgment will be reversed, even if the effect of such reversal would be to affect the title of the purchaser. (Pomeroy on Specific Performance of Contracts, sec. 204; Logan v. Bull, 78 Ky., 616; Hays v. Tribble, 3 B. Mon., 106; Aldrich v. Bailey, 132 N. Y., 85.)

OPINION BY JUDGE PAYNTER—Affirming.

George L. Douglas died testate, domiciled in Jefferson county, Ky., on the 8th day of October, 1889. His will was duly probated in the Jefferson County Court, and John W. Barr, the nominated trustee, was appointed and qualified. So much of the testament as is deemed pertinent to the subject-matter in hand is as follows:

"I appoint John W. Barr and William D. Carter my executors, and desire that they be allowed to qualify without giving any security. I devise the whole of my estate, real, personal and mixed, to my executors, upon the trusts hereinafter named, and they shall have power to sell any part of it with the written consent of my daughter, Sally R. Carter, and upon their own judgment after her death, and with the proceeds pay my debts and invest the remainder in stocks, bonds, real estate, or houses; and they may change with like consent said investments from time to time, as they may think best, and they shall hold the property so obtained upon the same trusts and with like control over it as they held and have over the original property.

"2d. They shall have the entire control over and management of my estate except as herein provided, and they shall hold the same in trust and for the sole and separate use of my daughter, Sally R. Carter,

during her life free from the control of any husband she may have, and they shall pay the whole income, after paying legacies, taxes, insurance, and other expenses, to her personally and not to her husband, and she shall have no power to sell or incumber said estate or income or to charge the same by way of anticipation.

"6th. Should my above-named executors fail to qualify, or should they resign, be removed, or die, I request the court to appoint such fit person to act as the administrator of my estate as my said daughter shall nominate, and to take from him such bond as may be proper, and the administrator so appointed shall have all the rights and powers over the property herein devised, to my executors, which are herein conferred on them. But in no event shall the husband of my said daughter act as my administrator, or perform the trusts herein devolved on my executors."

By the third and fourth clauses of the codicil to the will, the testator provided as follows:

"3d. All the rest and residue of my estate, real, personal, and mixed, left after payment of my debts, and the satisfaction of the legacies contained in the first clause of my will and the first and second clauses of this codicil, I devise and bequeath to John W. Barr as trustee, in trust as follows: For the sole and separate use of my daughter, Sally R. Carter, during her life, but without power to alien, incumber, charge, or in any way anticipate its rents, or enjoyment; and after her death, if any of my grandchildren shall then be dead leaving descendants then living, such descendants shall take per stirpes the same interest they would take if the property were then to descend from me, and the rest shall be held, managed, and controlled by the said

trustee, and the net income used by him in such manner as in his discretion may seem best for the interest of my surviving grandchildren, and his discretion shall extend to pay the share of each in said income into his hands or using it for his support, or paying it into the hands of his wfe, or using it for the support of such wife and his children, or allowing part or all of it to accumulate and subsequently using the accumulations in the same way, or allowing them to become and pass as a part of the capital, and no one or all of said grandchildren shall have any power to charge, anticipate, alien, or incumber said income or property, nor shall the same be in any manner subjected to his debts, and the trust as to my granddaughter's share shall be a sole and separate use, upon the death of any of said grandchildren, an aliquot share in said property shall pass to his descendants per stirpes, and in default of descendants living at his death, shall pass according to the laws of descent as if it then descended from him, provided that the shares of his surviving brothers and sister shall continue with their own shares in said trust and be governed by its terms. Said trust embraces my farm, containing about 210 acres, in Jefferson county, near the city of Louisville, and said trustee may sell said property with the assent of my daughter during her life, and with the assent of my adult grandchildren after her death, the proceeds to be invested in stocks, bonds, or real estate, and may change with like consent said investments from time to time as he may think best, and shall hold the property so obtained upon the same trusts and with like control as is fixed for the original property.

"4th. I appoint John W. Barr sole executor of this will and codicil, and request that he be allowed to

act as executor and trustee without any security being demanded of him, and in case of his death, resignation, or disability I appoint Alex P. Humphrey as executor and also as trustee, and this will and codicil shall be read exactly as if his name were substituted for that of said Barr, including all powers and discretions and the exemption from giving any security. 'In case of his death, resignation, or disability then a successor shall be provided and with the powers as prescribed in the sixth clause of my will.''

On the 30th day of March, 1891, John W. Barr, trustee, instituted an action in the Jefferson Chancery Court to settle his accounts, and was permitted to resign, and, Alex. P. Humphrey declining to accept the trust, Thomas O. Langdon was appointed. A part of the estate of George L. Douglas consisted of a farm of 210 acres fronting on the Bardstown pike, and running back in a northeastwardly direction to and across Beargrass creek, and being within a half mile of the city limits of Louisville as at present established. The city of Louisville purchased a large body of land westwardly of the farm, and converted it into a public park, known as ''Cherokee Park,'' and laid out and made a magnificent system of parkways and boulevards throughout the entire park, connecting with the streets of the city and the street car system of the Louisville Railway Company on the west. Cherokee Park lies on both sides of Beargrass creek, as did the Douglas property; the eastern line of the former being within a half of a mile of the western line of the latter. It was apparent that the rapid extension of the city toward the farm and the property of Cherokee Park made it to the interest of all the owners that it should be changed into suburban lots, and that, if

certain improvements and changes in the topography were made, the value of the property would be greatly enhanced. With this scheme in view, Thos. O. Langdon, as trustee, with the consent of Mrs. Sally R. Carter, employed Peyton L. Clarke to take the matter in charge and do everything necessary to accomplish the desired end. Without going into unnecessary detail, it may be said that the most important thing to be accomplished in furtherance of the scheme of improvement was to connect the farm with the park. This was done by persuading the intervening property owners to dedicate a part of their lands along and on both sides of Beargrass creek up to the Douglas farm, and then inducing the park commissioners to accept the land so dedicated, and improve it as a part of Cherokee Park. This was all most successfully and satisfactorily accomplished, and what had been an ordinary farm for raising corn and potatoes was transformed into suburban building lots, and called Douglas Park. Much else of minor importance was done, such as laying out roads and boulevards through the property, which it is not necessary to set forth in detail. After this was done, Clarke and the trustee agreed that the former's services were worth $5,000, and that in payment he should accept lot No. 3 of Douglas Park, and thereupon, on the 14th day of January, 1901, a deed was executed by the trustee and delivered to Clarke for the lot in question; Mrs. Sally R. Carter joining as grantor to express her approval, as required by her father's will. On the 11th day of August, 1904, Clarke sold and conveyed the lot to appellee, Nones, for the sum of $10,500, and on the 20th day of January, 1905, Nones entered into a written contract with appellant, Smith, for the sale of it to the latter for the sum of $13,500. In

pursuance of this contract of sale, appellee, Nones, executed and tendered to appellant a proper deed, which the latter refused to accept, on the ground that the trustee had no power to convey to Clarke a part of the trust estate, and therefore appellant had no title to the lot he was proposing to sell. Nones thereupon instituted this action in the Jefferson Circuit Court, setting up substantially the foregoing facts, and praying for a judgment requiring a specific performance of the contract, and a judgment against the appellant for the sum of $13,500. the purchase price of the lot. A general demurrer was interposed by appellant and overruled by the chancellor, whereupon he declined to plead further, and a judgment was rendered in accordance with the prayer of the petition, to review which this appeal is prosecuted.

No technical questions of pleading are urged, nor is the bona fides of any of the acts of the trustee and Clarke questioned, or any doubt expressed of the value of the latter's services. The question presented is purely one of power in the trustee to convey to Clarke a part of the trust property in payment for his services in the transaction described. No one can doubt the wisdom of the action of the trustee in the change made in the trust property, or that it generally enhanced the value of the estate as a whole, although a few acres in number were lost to the estate in the transaction. This is illustrated, perhaps better than in any other way, by the subsequent increase in the value of lot No. 3. In 1901 it was sold to Clarke for $5,000. In 1904 it was sold to Nones for $10,500. In 1905 it was sold to Smith for $13,500. There were no improvements made pending this devolution of title, and the respective sums show the intrinsic rise in the value of the land.

What the lot was worth before Clarke's services were performed does not appear in the record; but we think it may be fairly inferred, from the rapid increase in value since, that the sum of $5,000 was very largely in excess of its value before it was brought in touch with the park.

It is urged by appellant that the trustee had no power to diminish the trust estate, and that all improvements should have been made out of the income. Without stopping to examine this proposition too critically, it may be conceded to state the general rule with regard to trust estates held as is the one under consideration. But to this rule, as to most general rules, there are exceptions. In the first place, has the estate been diminished as a matter of fact? There has been a loss in the number of acres, certainly; but the value of the remainder is several times that of the whole before the improvement which caused the loss of acres. As an illustration, to bring the park to the farm it was necessary to convey several acres of Beargrass creek bottom to the park commissioners, and in order to bring all of the farm in touch with the park and with Bardstown pike it was necessary to lay out and dedicate a grand boulevard 100 feet wide and a half mile long. This transaction entailed a loss in acres to the estate, but it did not diminish it in value as a whole; on the contrary, it greatly increased its value. When one plots an estate into building lots, and lays out roads and streets, it is not generally thought that he has diminished his estate because he has decreased its acreage by the loss of the land contained in the dedicated highways. While it is true the ordinary expense of maintaining an estate must be borne by the life tenant, yet, where the expenditure is out of the ordinary, and is a substantial im-

provement enhancing the value of the estate as a whole, the tendency of modern authority is to divide the outlay equally between the life tenant and the remaindermen.

In Perry on Trusts, sec. 552, after stating the general rule that the trustee can not raise money on the corpus of the estate for repairs, and that the tenant for life must defray the expense of such re-pairs out of his own income, or the trustee must defray them out of the interest of the life tenant, it is said "that where a tenant for life makes large and permanent repairs, and subsequently the trustee sells the estate for the accommodation of all parties, the tenant for life may have a fair proportion for his repairs out of the corpus of the proceeds of the sale." And again: "Where a testator directs that the 'net proceeds,' after paying charges and expenses, shall go to the life tenants, all ordinary repairs and improvements and replacement of articles worn out are chargeable to the income; but probably a different rule would apply to a large and unusual expenditure, as for additional buildings."

In sec. 554, Id., it is said: "If, however, an assessment is made against the estate for something in the nature of permanent improvement or betterment of the whole estate, the assessment may be ratably and equitably divided between the tenant for life and the remainderman."

The case of Hite's Devisees v. Hite's Ex'or, 93 Ky., 257, 14 Ky. Law Rep., 385, 20 S. W., 778, 19 L. R. A., 173, 40 Am. St. Rep., 189, involved the construction of the power of a trustee under a will similar to the one under discussion here, and the rule governing the question we have in hand was thus stated: "If, however, any taxes upon, or sums by

way of improving, the unproductive real estate, have been paid out of the income of the other estate, the same should be allowed the life tenant out of the sales of the unproductive estate.   The testator never intended the life tenant to thus protect and add to the value of the real estate from which he was receiving no benefit.   The fair presumption is that the testator intended such a reimbursement.''

In the matter of Deckelman, 84 Hun., 476, 32 N. Y. Supp., 404, it is said: ''The material facts are not in dispute, but the appellant contends that repairs and improvements can not be made at the expense of the remainderman, but must be borne by the life tenant.   That such is the general rule is unquestionable, and it may be conceded that there is authority for the claim that the rule is invariable.   But there is now a tendency to limit the application of the rule stated.   In the recently decided case of Stevens v. Melcher, 80 Hun, 514, 30 N. Y. Supp., 625, it was held that certain permanent repairs on the trust realty should be charged to the corpus of the trust, not to the equitable life tenant.   In this case Judge Parker reviews at length the authorities on the question.   In both the reasoning and conclusion of Judge Parker we concur.''

We conclude, therefore, that the improvement in question of the trust estate was fully authorized by the large powers invested in the trustee with the consent of the testator's daughter, that lot No. 3 was lawfully conveyed to Peyton F. Clarke in payment of his services, and that this expenditure was no more to be borne by the life tenant alone than the loss of the acres conveyed to the park commissioners in order to connect the farm with the park, or the land dedicated to the establishing of public ways in order to convert the farm into building lots.

Wherefore the judgment of the chancellor is affirmed.